531 A.2d 782

**Marie Theresa BURKE**

v.

**Mary Modesto POPE, Appellant.**

Superior Court of Pennsylvania.

Argued June 23, 1987.

Filed Sept. 21, 1987.

Albert Monjian, Philadelphia, for appellant.

Joyce A. Monaco, Media, for appellee.

Before McEWEN, TAMILIA and HOFFMAN, JJ.

TAMILIA, Judge:

This is an appeal by Mrs. Mary Modesto Pope of a February 10, 1987 Order of the Court of Common Pleas of Delaware County awarding sole custody of her three minor daughters to Dr. Marie Theresa Burke with certain visitation and partial custody rights remaining in Mrs. Pope. Mrs. Pope is the natural mother of the children and contends that the hearing court acted against the best interest and welfare of her daughters by removing them from her custody and placing them with Dr. Burke, an unrelated non-parent, leaving her only visitation and partial custody rights.

This case commenced on March 25, 1985 when Dr. Burke, a former obstetrician-gynecologist, filed a petition seeking custody of Mrs. Pope's three children, Amanda Marie, Rebecca Ann and Abigail Leigh Pope.[1] On April 23, 1985, Mrs. Pope filed a petition for visitation and partial custody and on April 29, 1985, a response to Dr. Burke's original petition and a cross-petition for custody. The parties entered into stipulations, eventually adopted as Orders of court, on May 10, 1985 and July 2, 1985, which temporarily placed physical custody of the children with Dr. Burke and allowed Mrs. Pope visitation four hours a weekend on alternate Saturdays and Sundays. On December 12, 1985, Mrs. Pope filed a petition for special relief, pursuant to Pa.R.C.P. 1915.13, requesting modification of the temporary

1. Amanda Marie was born June 8, 1974, Rebecca Ann was born September 25, 1976 and Abigail Leigh was born April 1, 1979, making their respective ages approximately 11, 9 and 6 at the time of the petition for custody and 13, 11 and 8 at the time of this appeal.

custody Order and requesting an emergency Order for Christmas visitation. On December 18, 1985, the Honorable Howard F. Reed, Jr., ordered that Mrs. Pope have special visitation time with her children on Christmas day, 1985. On January 15, 1986, Dr. Burke filed a response to the December 12, 1985 petition and a cross-petition for special relief pursuant to Pa.R.C.P. 1915.13. On January 27, 1986, Mrs. Pope filed an answer.

In all, five hearings were held before the Honorable John V. Diggins, on January 28, February 27, April 21, June 5 and October 1, 1986. On June 12, 1986, Mrs. Pope filed a motion, pursuant to Pa.R.C.P. 1915.13, requesting entry of a partial custody Order. On June 18, 1986, Judge Diggins entered a temporary Order for partial custody, decreeing that Mrs. Pope have partial custody of her children each weekend from 12:00 noon on Saturday until 5:00 p.m. on Sunday. On August 27, 1986, Mrs. Pope filed a petition for contempt of the partial custody Order. Following the October 1, 1986 hearing, Judge Diggins directed Dr. Burke to comply with the previous temporary Order for partial custody. Finally, after the submission of post-trial briefs, on February 10, 1987, Judge Diggins filed an Opinion and Order awarding sole physical custody to Dr. Burke with visitation and partial custody rights to Mrs. Pope.[2] It is this final Order from which Mrs. Pope timely appeals.

The relationship of the parties began in 1967 when Dr. Burke, then forty-nine years old and a friend of Mrs. Pope's uncle, met appellant who was only an eleven year old girl. In 1974, at age seventeen, appellant married and subsequently had three children. During the marriage, the Pope

2. Under the February 10, 1987 Order, Mrs. Pope has the right to the children every other weekend from 12:00 noon on Saturday until 5:00 p.m. on Sunday, as well as for two weeks in the summer. During 1987, Mrs. Pope will have the right to the children on Easter, Memorial Day, Fourth of July, Labor Day and Thanksgiving from 9:30 a.m. to 9:00 p.m. and from 12:00 noon on Christmas day until 9:00 p.m. This holiday schedule shall alternate yearly, giving Dr. Burke the children thereafter, except as to Christmas, when Mrs. Pope, on the alternate year, shall have the children from noon on December 24th until noon on December 25th.

family frequently visited at the home of Dr. Burke, who was the mother's obstetrician-gynecologist. In 1978, after having physically and mentally abused the mother for sometime, the father abandoned his family while Mrs. Pope was pregnant with her third child, leaving her in a serious financial and emotional crises. Dr. Burke responded to this situation by inviting Mrs. Pope and her children to live with her until they could make suitable living arrangements for themselves. The family moved in with Dr. Burke in September, 1978 and she provided financial support for them for the next two years, including approximately two years of college tuition for Mrs. Pope.

The hearing court found that at the end of the first two years, Dr. Burke began to object to Mrs. Pope's social behavior involving her staying out late at night and occasionally overnight without notice with the result that the family moved to Mrs. Pope's parents' home. After approximately five weeks, Dr. Burke invited them back to her home so that the oldest daughter could finish the school year without interruption. Mrs. Pope accepted this offer and the family returned to the Burke home. However, a continuing deterioration of the relationship between Mrs. Pope and Dr. Burke occurred. This involved Dr. Burke's increasing her influence in the maintenance and care of the children and increasing her objections to alleged improprieties and moral failings of the mother, which eventually culminated in physical altercations between the women and the eventual expulsion by Dr. Burke of the mother from the Burke residence for one night. A few months after this incident, in April, 1982, Mrs. Pope left the Burke residence for the last time and went to New York, for one week, leaving no address or phone number where she could be reached. Just prior to her leaving and upon her return from New York, Mrs. Pope allegedly stated she would not return to the children nor did she want any part of them. The only access Dr. Burke had to the mother was by way of her therapist who arranged a meeting. From that time on the children have resided at the Burke residence away from the mother.

In the fall of 1982, Mrs. Pope was hospitalized for surgery but maintained frequent telephone contact with the children; however, the children were never brought to the hospital to see the mother. During 1983 and 1984, Mrs. Pope, while living with her parents, contends she was trying to raise sufficient funds for the family to get an apartment. During this period, the mother maintained weekly visits with the children as Dr. Burke would permit. In the summer of 1984, Mrs. Pope was hospitalized and returned to her parent's home. Near the end of 1984, following her recovery from another illness, Mrs. Pope contacted Dr. Burke and told her it was her intention to bring the children to her parents' home and an agreement resulted between the women that the children would be returned to Mrs. Pope at the end of the current school year in May, 1985. However, before this could take place, Dr. Burke commenced this action by filing a petition for custody on March 25, 1985. Dr. Burke did not deny Mrs. Pope visitation privileges until the spring of 1985 when Mrs. Pope tried to "forcibly" remove the children from Dr. Burke's babysitter's home. Subsequently, the lower court modified the existing stipulated visitation Order by entering a temporary partial custody Order, dated June 12, 1986, in favor of Mrs. Pope, which was in effect until the final custody Order, entered on February 10, 1987, from which this appeal arises.

Mrs. Pope argues on appeal that the hearing court abused its discretion and acted against the best interests of the children by concluding that Dr. Burke, a non-parent, met the heavy burden of persuasion that the parents' prima facie right to custody was forfeited and in determining that sole custody should reside in the non-parent. Further, the mother contends that the court misapplied the law and erred in its determination of material facts.

■ Our paramount concern in all custody cases is the best interests and permanent welfare of the child or children. *Albright v. Commonwealth ex rel. Fetters*, 491 Pa. 320, 421 A.2d 157 (1980); *Commonwealth ex rel. Miller v.*

*Miller,* 329 Pa.Super. 248, 478 A.2d 451 (1984). Other concerns such as the parent-child relationship should also be considered of importance in determining which custody arrangement is in the child's best interest. *Ellerbe v. Hooks,* 490 Pa. 363, 416 A.2d 512 (1980). Traditionally, in reviewing custody cases, appellate courts apply a very broad scope of review, but such review does not allow us to nullify the factfinding functions of the hearing court. *Albright, supra; Commonwealth ex rel. Bendrick v. White,* 403 Pa. 55, 169 A.2d 69 (1961). Although we are not bound by deductions or inferences made by a trial court from the facts it found existed, when reviewing custody cases, our Supreme Court has held:

> [A]n appellate court is empowered to determine whether the trial court's incontrovertible factual findings support the trial court's factual conclusions, but may not interfere with those conclusions *unless they are unreasonable in light of the trial court's factual findings* [,] ... and, thus, represent a gross abuse of discretion.... (Citations and footnote omitted; emphasis in original.)

*Lombardo/Grisor v. Lombardo,* 515 Pa. 139, 527 A.2d 525 (1987); *Commonwealth ex rel. Robinson v. Robinson,* 505 Pa. 226, 237, 478 A.2d 800, 806 (1984); *Jones v. Stone,* 343 Pa.Super. 416, 495 A.2d 205 (1985); *see also Commonwealth ex rel. Spriggs v. Carson,* 470 Pa. 290, 368 A.2d 635 (1977).

Upon review of the entire record, we are not satisfied the hearing court's resolution of the matter is adequate. Here, we have a child custody case involving a dispute between a parent and a non-parent. The proper standard of proof in resolving custody disputes between a parent and a third party was set forth by this Court in *In re Custody of Hernandez,* 249 Pa.Super. 274, 286, 376 A.2d 648, 654 (1977), and adopted by the Supreme Court in *Ellerbe, supra,* 490 Pa. at 367–68, 416 A.2d at 513–14, when we stated:

> When the judge is hearing a dispute between the parents, or a parent, and a third party, ... [t]he question still is, what is in the child's best interest? However, the parties

do not start out even; the parents have a 'prima facie right to custody,' which will be forfeited only if 'convincing reasons' appear that the child's best interest will be served by an award to the third party. Thus, even before proceedings start, the evidentiary scale is tipped, and tipped hard, to the parents' side. What the judge must do, therefore, is first, hear all evidence relevant to the child's best interest, and then, decide whether the evidence on behalf of the third party is weighty enough to bring the scale up to even, and down on the third party's side.

*See In re James John M.*, 333 Pa.Super. 417, 482 A.2d 637 (1984), and *Jones, supra* (both citing *Ellerbe* and *Hernandez*).

In implementing the broad scope of review possessed by an appellate court in a custody case, an *en banc* panel of our Court in *In re Donna W.*, 325 Pa.Super. 39, 472 A.2d 635 (1984) suggested four stages for examining custody matters: 1) the procedural stage, where the appellate court examines the record to determine whether the trial court has satisfied the procedural requirements necessary to the entry of a custody award; 2) the fact-finding stage, where the appellate court examines the trial court's findings of fact to determine if they are supported by the record; 3) the conclusion of law stage, where the appellate court determines whether the trial court has committed an error of law; and 4) the inferences and deductions stage, where the appellate court must consider what inferences and deductions to draw from the facts as drawn by the trial court, keeping in mind that the appellate court is not bound by the trial court's inferences and deductions, only its findings of fact. *In re James John M., supra.*

■ After engaging a broad scope of review, and after considering this case with these four stages in mind, we find Dr. Burke has not produced convincing reasons to support the heavy burden placed upon her to overcome the prima facie right to custody in the natural mother, Mrs. Pope. The hearing court based its decision on erroneous

legal considerations as well as some findings of fact that are unsupported by the evidence presented below. It is these fallacies in its reasoning that renders the trial court's final determination at odds with the best interest of the children in this matter. Although we fully acknowledge the time and effort spent by the trial court in rendering its decision, we feel that due to the nature of the third party's relationship with the children and the circumstances upon which this case arises, our broad scope of review in custody cases must be exercised in this matter.

In its Order and Opinion dated February 10, 1987, the trial court ruled that even though Mrs. Pope is not an unfit mother, the best interests of Amanda, Rebecca, and Abigail would be best served by their being placed in the custody of Dr. Burke, with whom the trial court found they had a strong "psychological bonding." As Dr. Burke admits (Appellee's brief, at 16), in rendering this decision the trial court incorrectly found that Mrs. Pope had an inadequate residence, a long distance from the Burke residence, at her parents' home (Slip Op., Diggins, J., 2/10/87, p. 23);[3] when in fact the record shows that Mrs. Pope has lived by herself in a four-level townhouse, with three bedrooms, two and one-half baths, and playground facilities nearby, since August, 1985 (N.T. 1/28/86, p. 18). Additionally, the trial court found that in the summer of 1982, Mrs. Pope "signed a document granting legal custody of the children to Dr. Burke" (Slip Op. at 11, 8); however, no such agreement was ever submitted in the pleadings or entered during the hearings. The only reference to the alleged document is Dr. Burke's testimony that she asked Mrs. Pope to give her a "paper" that said Dr. Burke had "responsibility" for the children, with the idea in mind that she could authorize

---

**3.** The importance the trial court placed on this finding is evident from its Opinion:

> This record indicates that the Mother has no separate abode to which the children might be taken but must rely on the fact that, they can be accommodated at her parents' home while Dr. Burke provides an adequate physical environment. These comparisons must be considered in determining the best interest of the children.

(Slip Op. at 23.)

medical assistance for the children when she took them on a trip to Florida (N.T. 4/21/86, pp. 39–40). Without more, the record clearly cannot support a finding that "legal custody" of the children was given to Dr. Burke by the mother at anytime.[1]

In addition to these erroneous findings of fact, we find the trial court committed an error of law in determining the best interest and welfare of the children by weighing too heavily the "psychological bonding" it found existed between the children and Dr. Burke. Our Court has rejected the argument that bonding can be determinative of a child's best interest. *In re Donna W., supra.* "While psychiatric considerations may very well be important, they must not be made determinative, for in deciding upon a child's best interests the court must take many factors into account....," such as parents' rights. *Id.* 325 Pa.Super. at 58, 472 A.2d at 644. As we stated in *In re Desiree B.*, 304 Pa.Super. 461, 468–469, 450 A.2d 1003, 1007 (1982), *"The question of bonding should not be the only one or the deciding factor."* (Emphasis in original.)

■ From a thorough review of the hearing court's Opinion it is evident that although the court refers to the "best interest" of the child standard we applied in *Hernandez, supra,* we find it placed undue weight on "psychological bonding," terming it "the new theory regarding the rights of foster parents versus the biological parents" that *Hernandez* "pre-dates". (Slip Op. at 21.) After quoting and referring to an article on the psychological parent doctrine

---

4. Incident to this is the hearing court's insistance that both in a de facto and a de jure sense Dr. Burke is the equivalent of a "foster parent" and a "surrogate mother" and its determination that to argue differently is meritless (Slip Op. at 23–24). While Dr. Burke may be considered a second or "foster" mother—using the term loosely—in a de facto manner, it is wholly inaccurate to describe her as a "foster mother" in a de jure sense, due to there being no application or compliance with the legal requirements necessary for such a title. At best, Dr. Burke can be thought of as operating in loco parentis during certain periods of the parties relationship.

in custody disputes between biological parents and foster parents,[5] the trial court concluded:

> The bottom line is that the psychological parent child relationship rather than the biological tie is the crucial factor for the child's bond to the adult.

> . . . .

> The psychological parent doctrine recognizes an exceptional circumstance in which a biological parent's custody of the child, may be detrimental because the child views another adult as his parent figure. Thus it forms an exception along with unfitness and abandonment to a parent's right to custody. The crucial question is whether the child has such a firm attachment to the foster parent as a parent figure that removal would be difficult and likely to cause substantial emotional harm and if such philosophers as Goldstein, Freud and Solnit suggest that child custody disputes be governed by the least detrimental available alternative which in this case we find to be sole custody [in the non-parent, Dr. Burke] with visitation rights in the biological Mother.

(Slip Op. at 17–18.) The trial court's equating the "psychological parent doctrine" with unfitness and abandonment as exceptional factors that can override the parents' prima facie right to custody derived from *Curtis, supra,* is contrary to our holdings in *In re Donna W., supra,* and *In re Desiree B., supra.*

This undue weight on psychological considerations coupled with erroneous findings of material facts warrant our reversing the hearing court's award of sole custody in Dr. Burke. It is unnecessary to remand this case to gather further evidence in light of the extensive record compiled from the five hearings held below. Ample opportunity to present testimony has been given both sides and we see no need to supplement the record.

5. Curtis, *The Psychological Parent Doctrine in Custody Disputes Between Foster Parents and Biological Parents,* 16 Colum. J.L. & Soc. Probs., 149–192 (1980). *See also Beyond the Best Interest of the Child,* J. Goldstein, A. Freud and A. Solnit (1973).

The error which is easily fallen into by an uncritical adoption of the concept of psychological parenting when it rejects the legal concept of "best interest" is that a child out of parental custody may be doomed to placement outside the home without reasonable efforts being made to rekindle the parental bond and to reestablish the psychological parenting in the parents. Time with children is an essential element and the child's concept of time may not be ignored. A six-month old child placed outside its home, within a period of three to six months, may attach psychologically to the foster parents, which would then, under the doctrine of psychological parenting, mitigate against its return. A two-year old might be snatched by one parent or kidnapped by a stranger and not be located for several years, having established deep psychological attachment to the parenting person. Would we wish to deny return to the rightful parent for that reason? Children who had primary attachment with the parent during the formative years retain those residual attachments despite long separation, especially, as here, when they have been maintained and reinforced by contacts and visits of various duration over the years, despite periodic disruptions. Regardless of what the children might say, they may not feel an attachment to Dr. Burke that is so overwhelming as to preclude resettlement with the mother if properly implemented with guidance and social service support. Child development and interpersonal relationships are too complex and inadequately understood to create an inflexible rule that considers only the child's immediate condition and avoidance of present trauma to the child as a counterbalance to the parents' rights. The "least detrimental alternative" relied upon by the trial court, based on the philosophy of Goldstein, Freud and Solnit, controls the determination solely from the child's point of view. This fault is fatal, for the court cannot ignore the parents' rights without offending constitutional principles. In fact, the authors, recognizing the legal, constitutional and social deficiencies inherent in the philosophy expounded in *Beyond the Best Interest of the Child,* followed it by *Before the Best Interest of the Child,* J.

Goldstein, A. Freud and A. Solnit (1979). There, the authors proposed that *before* a child was removed every reasonable effort be made to retain the child in the parental home by utilization of court and social services to improve parenting and ameliorate deficiencies that might ultimately lead to separation. Thereafter, failing in this effort over a reasonable period of time, separation would be permitted and ultimately, in a carefully structured time sequence, termination of parental rights and adoption by adequate caretakers would be undertaken. The latter proposal has received far more acceptance than the earlier and was timely in that there was a strong national movement toward early intervention and prevention to avoid foster placement and to bring about permanent placement in a relatively short period rather than to have interminable periods of foster placement with the child living his life in the limbo of foster care. This doctrine is endorsed by federal legislation and policy, Adoption Assistance and Child Welfare Act of 1980 (Public Law 96–272, June 17, 1980) and by follow-up state legislation and policy, Involuntary Termination of Parental Rights, 23 Pa.C.S. 2511; 55 Pa.Code § 3130.61 *et seq.* and § 3140 *et seq.*

This leads us to conclude a remand is required in this case. As we said in *Hernandez, supra,* in a dispute between a parent and a third party,

> The question still is, 'What is in the child's best interest?' However, the parties do not start out even; the parents have a prima facie right to custody, which will be forfeited only if convincing reasons appear that the child's best interest will be served by an award to the third party. Thus even before the proceedings start, the evidentiary scale is tipped hard to the parents' side.

*Hernandez,* 249 Pa.Super. at 286, 376 A.2d at 654. By adopting the principle of the "psychological parent" and the "least detrimental alternative" and concluding that these doctrines have abrogated the fitness doctrine, and by inference that of the best interest of the child, by implication, if not in fact, the court presumed the children would be best

served by remaining with Dr. Burke; the mother was thereby deprived of the heavy weight of the scales in favor of her prima facie right to custody. Had the trial court not viewed the case in this fashion, it is likely it would have given greater weight to testimony in favor of the mother's improved social and housing status; to the testimony of the neutral psychologist who favored an effort at reconciliation and partial custody to gradually reinvolve the children and mother with each other and to attempt to bring Dr. Burke and the mother together. Instead, the court accepted uncritically the testimony of the psychiatrist procured by Dr. Burke while rejecting that of the neutral psychologist. In a reversal of what would be expected, the neutral psychologist is considered biased despite interviews and counselling of the children and both adults, whereas the privately procured psychiatrist and psychologist, who never talked to the mother, were afforded credibility.

Had this case been a foster care case dealt with through the juvenile court and an agency, the law and the court would have required and demanded that substantial efforts be made to improve parenting and reunite the children with their mother. *See* Juvenile Act, 42 Pa.C.S. §§ 6331 *et seq.;* Child Protective Services Law, 11 P.S. §§ 2201–2224. As a free floating non-directed, non-judicial arrangement, this case provided no such effort. Unless such efforts are undertaken, we will never know if the family can be reunited. Failing to heed the suggestions of the neutral psychologist, the court did not consider a creative plan that could lead to reunification. The trial court treated the mother's attempt at enforcing a court Order for visitation as harrassing behavior toward Dr. Burke who called the police. The mother received admonishment not to do this again. The trial court ignored the mandate of the Shared Custody Act, 23 Pa.C.S. 5301 *et seq.,* which requires a consideration of which of the parties is most likely to encourage the parental relationship, and while shared custody is not presumed, it must be carefully considered as it

applies to the facts of each case and it may not be ignored. We agree with the trial judge that it is not appropriate in this case, but it is not merely a theory which may be ignored.

One other consideration which makes imperative the need to move toward reconciliation of the children and their mother is the relative age of the mother (30) and Dr. Burke (61). The court makes no mention of this fact and the possible implications to the permanent welfare of the children. Obviously time is on the mother's side and the continuing need for the children and their mother to be together and to sustain each other long after Dr. Burke is gone is a reality. Dr. Burke's relationship is more akin to that of a grandmother rather than a mother figure. The relationship between her and Mrs. Pope is analogous to that between a mother and wayward daughter which carries over into a struggle for control of grandchildren. Granted, age is irrelevant if adequate care is not present, yet consideration and exploration of this factor is necessary.

The visitation and partial custody ordered in this case was minimal and not conducive to an improvement in the relationship between mother and children. Visitation was limited and placed environmental and emotional restrictions on the children and the mother toward improving their relationship. Formulation of a plan, leading to custody in the mother and minimizing harm to the children with partial custody of increasing duration, accompanied by counselling over a stated period of time, would be desirable and effective. The trial court acknowledges the children profess love for their mother and that the mother is fit. He even hints at an eventual change of custody if conditions warrant.

Dr. Burke has generated strong emotional bonds between the children and herself. A serious and reasonable attempt should be made to lessen these bonds and to increase those with the mother. The mother will never have the opportunity to strengthen her bonds to the children and her capacity

to parent if Dr. Burke has total control of all meaningful aspects of the children's lives and the mother is precluded from involving herself in the process. The obstructionist tendencies of Dr. Burke were pointed out by the jointly-chosen neutral psychological expert Andrew R. Vogel (R. 1140a–41a).

■ We view this case as similar to that in which an agency is involved in respect to the standards to be employed for consideration of return of the children to a parent who has been found to be fit, when the child has been in foster placement. Under such conditions, a definitive plan would be established to 1) affirmatively move toward reunification as a goal, 2) provide psychological counselling to facilitate this progress, 3) gradually increase partial custody and 4) establish a time frame within which this process will be completed and full custody in the mother established. Six months to one year should be sufficient time to work through this process.

Such a program is difficult and requires effort and cooperation by all parties and monitoring by the court, but it is routinely employed in child welfare cases with substantial success. It is workable here and is directed toward the permanent welfare and best interests of the children, while it does not ignore the present realities and emotional ties between the children and Dr. Burke. The mother will not be permitted an automatic return without establishing her commitment and capacity to perform adequately as a parent. This will become evident from monitoring by treatment personnel. Hopefully the result will include a continuing relationship with Dr. Burke which will not interfere with the relationship between the mother and her children.

The custody and visitation Order is, therefore, vacated and the case remanded for imposition of an Order consistent with this Opinion.

Jurisdiction relinquished.