903 F.2d 212
 DAVIS, Sara Lynn, on behalf of herself and all persons
similarly situated, Morris, Theresa Yochum, on
behalf of themselves and all persons
similarly situated
v.
THORNBURGH, Richard, Governor for the Commonwealth of
Pennsylvania in his official capacity and Zimmerman, Leroy,
Attorney General for the Commonwealth of Pennsylvania in his
official capacity and Cohen, Walter, Secretary of the
Department of Welfare in his official capacity and
McClinton, Mr. & Mrs. Kevin and Ullman, Roger, individually
and as representative of a class of all intermediaries under
the Pennsylvania Adoption Act and The Honorable Francis J.
Catania in his official capacity and as a representative of
a class of all trial judges in Pennsylvania.
Appeal of Sara Lynn DAVIS.
 No. 89-1559.
 United States Court of Appeals,
Third Circuit.
 May 15, 1990.
Opinion on Denial of Rehearing and Rehearing In Banc June 22, 1990.
 
 Ann S. Torregrossa (argued), Delaware Co. Legal Assistance Assn., Chester, Pa., for appellant.
 Ernest D. Preate, Jr., Atty. Gen., Janice L. Anderson (argued), and Kate L. Mershimer, Deputy Attys. Gen., John G. Knorr, III, Chief Deputy Atty. Gen., Chief, Litigation Section, Office of Attorney General, Harrisburg, Pa., for appellee Cohen.
 Elizabeth R. Aaron (argued), Jon J. Auritt, Law Offices of Jon J. Auritt, Media, Pa., for appellees Kevin McClinton and Carole McClinton.
 G. Guy Smith, Harris and Smith, Media, Pa., for appellee Roger Ullman.
 Howard W. Abramson, Nancy E. Gilberg, Philadelphia, Pa., for appellee Hon. Francis J. Catania.
 Before BECKER, GREENBERG, and NYGAARD, Circuit Judges.
 OPINION OF THE COURT
 GREENBERG, Circuit Judge.
 
 
 1
 This matter is before the court on appeal by Sara Lynn Davis from an order of June 8, 1989, entered June 9, 1989, finally dismissing this action and denying her motion to reconsider an oral determination of February 8, 1988, denying class action certification and dismissing this case and denying her motion to reconsider an order of February 5, 1988, granting one defendant a partial dismissal and another summary judgment.[1] The case involves proceedings under the Pennsylvania Adoption Act, 23 Pa.Cons.Stat.Ann. Sec. 2101 et seq. (Purdon 1989), and, in particular, claims asserted by Davis that parents placing their children through private intermediaries are denied due process and equal protection of the law. We will affirm. For convenience, we will cite to the Adoption Act using the sections as set forth in the Pennsylvania Consolidated Statutes.[2]
 
 
 2
 We are constrained to describe at length the protracted procedural and factual history of this case which has involved numerous proceedings in both the Pennsylvania state courts and the district court. The matter may be said to have originated when Davis, who was not then married, gave birth to a child, Angela, on December 18, 1984. Davis was then 21 years old, was unemployed and had limited financial resources.[3] Thus, though she would have preferred to keep Angela, while still hospitalized following Angela's birth, Davis signed a consent form authorizing her placement in a private adoption. However, she promptly changed her mind and accordingly revoked the consent form and took Angela home from the hospital when Angela was discharged.
 
 
 3
 Thereafter Davis and Angela resided with the family of Davis's then boyfriend, who was not Angela's father. However, some months after Angela's birth, Davis gave Angela's father custody of her for a short time. In the summer of 1985 Davis was in difficult circumstances as she was compelled to move from her boyfriend's parents' home and needed a new place to live. Furthermore, she could not obtain employment yielding an income adequate for her needs, as she only had a tenth grade education. Accordingly, she concluded that her only recourse was to place Angela for adoption.
 
 
 4
 Consequently, Davis contacted Roger Ullman, an attorney in Delaware County, Pennsylvania, who acted as an intermediary in adoption proceedings, and asked him to arrange for Angela's adoption. On July 12, 1985, Davis signed a form consenting to Angela's adoption, prepared by Ullman in accordance with Adoption Act Sec. 2711(d)(1), and thus including the language required by that section. The form provided that Davis did "hereby consent to the adoption of said minor child," "fully understands that by these proceedings she surrenders forever all her rights as a parent of said minor child to the end that said minor child may be adopted by said undisclosed adopting parents," "waives and releases any and all rights relating to the care, custody, and welfare of said minor child," and "permanently give[s] up all rights to this child." It further set forth that Davis "may not revoke this consent after a Court has entered a Decree confirming this consent or otherwise terminating my/our parental rights to this child. Even if a Decree has not been entered terminating my/our parental rights I/we may not revoke this consent after a Decree of Adoption of this child is entered." On the day that the form was signed, July 12, 1985, Davis gave custody of Angela to Ullman and Davis has never since seen her.
 
 
 5
 At the same time that Davis was giving up Angela for adoption, Kevin and Carole McClinton, a married couple from New Jersey, were seeking to adopt a child. Through advice from a relative, they were advised that an attorney working with a public agency, Delaware County Children and Youth Services, had a baby available for adoption. This attorney was Ullman and the McClintons got in touch with him, made arrangements to take custody of Angela and, on July 13, 1985, picked her up and took her to their New Jersey home. At that time, they paid $2,500 into escrow to Ullman to cover fees. They also signed a form required by Adoption Act Sec. 2531(b)(5) which provided that they understood that the natural parent could "revoke the consent to the adoption of this child until a court has entered a decree terminating the parental rights, and, unless a decree terminating parental rights has been entered, the natural parent may revoke the consent until a court enters the final adoption."[4]
 
 
 6
 Davis changed her mind about the adoption almost at once and, on July 16, 1985, she advised Ullman that she wanted to revoke her consent and have Angela returned. Angela, however, was not returned and therefore on August 27, 1985, Davis wrote a letter to Ullman and to Judge Francis J. Catania of the Court of Common Pleas of Delaware County, Orphan's Court Division, revoking the consent to adoption executed on July 12, 1985.[5] Nevertheless Angela was still not returned to Davis. Rather, Ullman, acting as an intermediary under the Adoption Act, that is, a person acting between the parent and proposed adoptive parents in arranging an adoption placement, see Adoption Act Sec. 2102, filed a report of intermediary, see Adoption Act Sec. 2533, and a report of the intention to adopt on behalf of the McClintons on September 10, 1985, see Adoption Act Sec. 2531, seeking to confirm Davis's consent to the adoption.
 
 
 7
 A hearing was held on September 23, 1985, in Judge Catania's chambers. It appears that no evidence was taken at that time and that the only persons present were the judge, Ullman, Davis and Davis's attorney, Suzanne Noble, a legal services attorney. Judge Catania determined that Davis had timely and validly revoked the consent but he ruled that the McClintons could keep Angela, Delaware County Children and Youth Services should do a home study on Davis, and the Child Guidance Mental Health and Mental Retardation Clinic of Delaware County should make an examination of Davis.
 
 
 8
 On the same day, Davis, apparently represented by Noble, initiated a separate proceeding in the Delaware County courts, seeking custody of Angela. Those proceedings were, however, stayed on October 30, 1985, by an order of Judge Catania "pending resolution of the adoption case."[6]
 
 
 9
 On November 7, 1985, the McClintons filed a petition to terminate Davis's parental rights under Adoption Act Sec. 2512, and this petition was served on Davis on November 13, 1985. A hearing originally scheduled on the McClintons' petition for December 2, 1985, was, over Davis's objection, postponed until January 7, 1986, when Davis, represented by an attorney, appeared to contest the matter. A plenary hearing was held with testimony taken over the course of several days. On January 28, 1986, the court entered a decree "that the prayer of the [McClintons] be granted and that the parental rights of [Davis] to [Angela], are hereby relinquished, extinguished and terminated and custody of [Angela] is awarded to [the McClintons]."
 
 
 10
 Judge Catania filed a comprehensive opinion explaining his decision.[7] While it is not necessary to set forth all the facts, they should be highlighted. The evidence showed that Davis had lived with Angela's father before her birth and that the main problem between them stemmed from her use of drugs. Ultimately the relationship ruptured and they were separated when Angela was born. They did, however, have some contact after the birth and at Davis's insistence the father signed papers giving up his parental rights. During the fall of 1985, Davis held several jobs but, according to her employers, she lost them because of her absences from work and shortages from cash registers attributed to her. Testimony of Paul Snyder, her boyfriend's father, in whose home she had been living, showed that in the six months that she lived there with Angela after Angela's birth, Davis did not show affection towards her. Judge Catania accepted Snyder's testimony that he never saw Davis kiss Angela and that whenever anyone else was available to take care of Angela, Davis was anxious to let that person do it.
 
 
 11
 The judge noted that Davis had previously been married and that her first husband testified that they had lived together in Canada, separated in December 1983, and that she had not been back to see her two children of that marriage since then. This first husband described Davis's lack of child rearing skills in considerable detail and pointed out that on one occasion, shortly before they married, she attempted to commit suicide. His testimony regarding her neglect of the children was corroborated by several neighbors.[8]
 
 
 12
 The judge noted that a court appointed psychiatrist, Dr. James H. Ewing, examined Davis and indicated that she had a dependent personality disorder and possibly a passive/aggressive personality disorder. Ewing did indicate, however, that she was of at least average intelligence and was motivated toward treatment and might do well with it. The judge then indicated that Ewing said he had questions about Davis completing a course of treatment and that Angela should not at that time be returned to Davis. The judge had previously appointed Richard James, an attorney, as guardian ad litem for Angela. After what Judge Catania said were "extensive interviews and investigation" James found that Davis had "no housing, no plan, no day care" and he requested termination of her parental rights.
 
 
 13
 The judge concluded that Davis showed a repeated and continued incapacity, abuse, neglect or refusal to care properly for Angela, had caused her to be without essential parental care, control or subsistence and that the cause of these conditions could not or would not be changed. Thus, there were grounds for termination under Adoption Act Sec. 2511. He found that Ullman had acted totally properly and had fully advised Davis of the consequences of her actions. The judge pointed out that Davis had no plan to care for Angela. He also concluded that the decision to give up the child was "conscious" and that the causes of her incapacity, neglect and refusal to care for the child "will not be remedied."
 
 
 14
 Davis appealed to the Superior Court where a three judge panel, one judge concurring in result, affirmed in a comprehensive opinion by Judge Beck on December 3, 1986.[9] See In re Adoption of A.N.D., 360 Pa.Super. 157, 520 A.2d 31 (1986). Judge Beck reviewed the testimony and pointed out that Dr. Robert Keller, a psychologist testifying for Davis, confirmed that she had a "personality disorder with passive aggressive features affecting appellant's current ability to parent" but that if she stayed in therapy "there was a fairly good chance that some of her substantial problems could be resolved." The Superior Court concluded that Judge Catania did not abuse his discretion in terminating Davis's parental rights under Adoption Act Secs. 2511(a)(2) and (b), a conclusion it reached after a careful review of the facts and an equally full review of the applicable Pennsylvania statutes and case law. The Supreme Court of Pennsylvania denied allocatur on October 28, 1987. See 516 Pa. 638, 642, 533 A.2d 710, 713 (1987).
 
 
 15
 Davis had not waited passively for the Superior Court decision. Rather, immediately upon the entry of Judge Catania's order of January 28, 1986, she brought this action under 42 U.S.C. Sec. 1983 now on appeal before us. On January 28, 1986, she filed a motion for leave to proceed in forma pauperis and, upon the granting of that motion, she filed her complaint in the district court on January 30, 1986. The gravamen of her twice amended complaint, brought on behalf of herself and as a class action on behalf of all persons similarly situated, is described by Davis in her brief on this appeal as follows:
 
 
 16
 This action seeks injunctive relief and a declaratory judgment that the Pennsylvania Adoption Act is unconstitutional because it mandates the use of a vague, misleading and contradictory 'consent' form pursuant to which natural parents give up their children for adoption through private intermediaries. Among other things, the consent form deceptively characterizes their rights when they consent to an adoption, and misleads them as to the consequences attendant upon their timely and legal revocation of such consent. The action also seeks to have declared unconstitutional (a) the failure of Pennsylvania law to provide for prompt and expeditious due process to natural parents after they timely revoke their consent to adoption, and (b) those procedures of Pennsylvania law which impermissibly distinguish between two classes of natural parents who timely revoke their consent to adoption--those who place their children for adoption with the state (who are given mandatory evidentiary hearings and extensive parenting services) and those who do so privately (who receive neither a hearing nor parenting services), in violation of the equal protection clause of the United States Constitution.
 
 
 17
 Though Davis originally sought Angela's custody, she no longer does and she asserts that she does not wish to have set aside either the order of termination of her parental rights entered by Judge Catania, or a subsequent adoption of Angela by the McClintons.[10] Nor is Davis asking for damages. Rather, Davis now seeks visitation rights with Angela and an order that the McClintons be required to supply her with periodic reports regarding Angela.
 
 
 18
 Davis originally named as defendants Richard Thornburgh, Governor of Pennsylvania, Leroy Zimmerman, Attorney General of Pennsylvania, and Walter Cohen, Secretary of the Pennsylvania Department of Public Welfare, all in their official capacities, Ullman, and the McClintons. On July 28, 1986, she filed a motion for class certification. The class which Davis has sought to represent is the parents who have executed or will execute a consent form under Adoption Act Sec. 2711, and those who have timely revoked or will timely revoke their consent to private adoptions pursuant to Adoption Act Sec. 2711 but are nevertheless denied the return of their children, who have not been the subject of a final adoption decree.[11]
 
 
 19
 On October 10, 1986, the action was dismissed as to Thornburgh and Zimmerman and, as Davis has not appealed from those dismissals, we make no further reference to those two defendants. The district court at that time also dismissed the matter as to the McClintons, holding that they were not state actors subject to 42 U.S.C. Sec. 1983 but Davis has appealed from that disposition.[12] Accordingly, the order of October 10, 1986, left only Cohen and Ullman as defendants, though it granted Davis leave to file an amended complaint, which she did on November 10, 1986, adding Judge Catania as a defendant. On November 19, 1986, the district court denied the July 28, 1986, motion for class certification with leave granted Davis to file a new motion. Judge Catania then filed a motion to dismiss which was denied on April 16, 1987. On February 9, 1987, Davis filed a second motion for class action certification but it was denied without prejudice on May 8, 1987.
 
 
 20
 On July 20, 1987, Davis filed a second amended complaint and she subsequently sought a class action certification for the third time. Judge Catania then moved to dismiss the second amended complaint and Ullman moved for summary judgment. On February 5, 1988, the district court filed a memorandum opinion on those motions. It dismissed the matter as to Ullman under Fed.R.Civ.P. 12(b)(6), as it concluded that he had acted as a private attorney and not as a state actor in the termination and custody proceedings and thus was not a viable defendant under 42 U.S.C. Sec. 1983. See Tower v. Glover, 467 U.S. 914, 104 S.Ct. 2820, 81 L.Ed.2d 758 (1984); Polk County v. Dodson, 454 U.S. 312, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981). However, the court denied Judge Catania's motion because prospective injunctive relief was sought against him on the theory that he had promulgated unconstitutional procedures in termination cases and thus was not entitled to judicial immunity. See Pulliam v. Allen, 466 U.S. 522, 104 S.Ct. 1970, 80 L.Ed.2d 565 (1984).[13]
 
 
 21
 Accordingly, when the case was reached for trial on February 8, 1988, the only defendants were Judge Catania and Cohen. At that time there was colloquy between the court and the attorneys, all parties being represented by counsel. The court pointed out that it would not relitigate matters resolved in the state proceedings and that the state court findings would be adopted. The court was advised that Davis then lived in Las Vegas, Nevada, and that she did not seek custody of Angela but wanted visitation with her and wished for annual reports from the McClintons regarding her. Furthermore, Davis indicated that "she would like to be able to have the opportunity to have a relationship with her daughter when her daughter is older, should her daughter wish to have one. She is also seeking declaratory relief."
 
 
 22
 There was then discussion regarding whether Davis's application for visitation could be filed in the state courts. The court pointed out that circumstances had changed from those extant when Davis originally sought custody. Davis indicated that if the court found that she did not have standing "there could never be a review by the federal courts of the due process of whether or not this consent form meets due process requirements." Ultimately, the court indicated that "as far as the consent form is concerned here, it is moot here because the Superior Court found that something was revoked." Thus, "the revocation was ineffective because [the Pennsylvania courts] involuntarily terminated her parental rights. So the consent had nothing to do with it." Davis objected that she was "asking [the court] to rule on the constitutionality of this form and this procedure that started her down that terrible road."
 
 
 23
 The court then indicated that Davis did not have standing but Davis responded that the case was the kind "where the usual doctrine of mootness is not considered" because it "is capable of repetition" but "can never be reviewed unless you make an exception to the mootness." The court reiterated that the case was moot, that it was a question of "fundamental standing," that Davis was not an adequate class representative and did not even live in Pennsylvania. Thus, it denied Davis's motion for class certification.
 
 
 24
 Thereafter, Judge Catania argued that the issues raised in the district court case should have been raised in the state proceedings and that, in effect, the district court case was a collateral attack on the state case. Davis denied that allegation, urging that the only issue in the Superior Court was whether Judge Catania acted properly in terminating Davis's parental rights, a matter Davis did not think was "linked" to the issues raised in the district court. The court then said that Davis did not have standing, the case was moot, and Davis had not been denied equal protection. Davis then said she wanted to make an offer of proof and the court suggested she do that in writing in the form of a motion for reconsideration.[14]
 
 
 25
 Thereafter, Davis did file a motion for reconsideration, which the court denied in the memorandum and order of June 8, 1989, from which she appeals. In that memorandum the court indicated that to have standing a plaintiff must have suffered "an actual injury which this court can redress," citing Director, Office of Workers' Compensation Programs v. Perini North River Associates, 459 U.S. 297, 305, 103 S.Ct. 634, 641, 74 L.Ed.2d 465 (1983). It then said that Judge Catania's findings regarding Davis's "ability to handle parenting apply here and cannot be disturbed." It pointed out that the Superior Court had affirmed Judge Catania's order and the Supreme Court of Pennsylvania had denied allocatur. The court considered that it could not grant the relief that Davis sought and thus she did not have standing. The court also held that the matter was moot as to Davis as the situation was not likely to be repeated as to her and, indeed, because the case was fact specific, would not be likely to be repeated as to other persons either. The court also held that Davis had not been denied equal protection of the law, notwithstanding her claim, as characterized by the court, "that those parents who place their child through an agency are entitled to services which are not provided to parents placing their children through intermediaries." This decision on the merits was based on the court's analysis of Pennsylvania procedures. The order of June 8, 1989, denying reconsideration was then filed and this appeal followed.
 
 
 26
 On this appeal, Davis contends that she has stated a claim under 42 U.S.C. Sec. 1983 for violation of her constitutional rights and that the district court improperly dismissed her complaint without considering her due process challenges to the Adoption Act. She further asserts that the court should have considered her contention that the consent form mandated by Adoption Act Sec. 2711 by which she surrendered Angela was invalid and should also have considered the argument that the absence of a provision in the Adoption Act mandating the holding of a prompt evidentiary hearing before she was deprived of her child rendered the Act unconstitutional. She further contends that she has stated an equal protection claim because of the differing treatment the Adoption Act provides to parents who place their children for adoption with state agencies as compared to those placed through private intermediaries. In this respect, she asserts that in cases of revocation of consent to adopt in state agency cases, but not private intermediary cases, if the child is not immediately returned, there must be a hearing regarding parental fitness and parenting services must be provided.
 
 
 27
 She also claims that she has standing to sue, the case is not moot, and Ullman is a proper defendant under 42 U.S.C. Sec. 1983, as he has performed a state function, the placement of children for adoption. She maintains that the McClintons also are proper defendants as they acted under color of state law, in that Pennsylvania has delegated to them the duty to place children in suitable adoptive homes by giving them standing to initiate proceedings terminating parental rights. Finally, Davis contends that the court erred in refusing to certify the matter as a class action.
 
 
 28
 We conclude that while the proceedings have been complex and protracted, and the legal issues tendered on the appeal quite far reaching, the appropriate resolution of this appeal is manifest. The complaint as amended seeks to protect two interests, those personal to Davis and those of the putative class. The personal interests of Davis may be divided into two parts, first, those directly concerning Angela, and second, Davis's general claim for relief based on allegations that, regardless of what rights she may have to Angela, she is personally entitled to litigate the issues presented.
 
 
 29
 We deal first with Davis's claims regarding Angela. In the Common Pleas Court the McClintons filed a petition under Adoption Act Sec. 2512(a)(3) and obtained a valid and enforceable order of January 28, 1986, in a proceeding contested between themselves and Davis, which was affirmed on appeal. In view of that order Davis has no parental rights to Angela, as the order provided unambiguously that Davis's rights were "relinquished, extinguished and terminated." Furthermore, under Adoption Act Sec. 2521(a) "all rights" of Davis to Angela have been terminated.[15] While Davis has cited cases for the proposition she posits that "Pennsylvania law allows visitation and similar remedies to nonparents of the child," none deal with a situation in which a parent's rights have been terminated and thus none leads us to question the clear import of the order of January 28, 1986, or the Adoption Act. See Commonwealth v. Coburn, 384 Pa.Super. 295, 558 A.2d 548 (1989); Seger v. Seger, 377 Pa.Super. 391, 547 A.2d 424 (1988); Burke v. Pope, 366 Pa.Super. 488, 531 A.2d 782 (1987). Rather, the cases, insofar as significant here, simply stand for the unremarkable proposition that some rights akin to those of a parent may be asserted by a person who is not a child's biological parent.
 
 
 30
 The fact is that Davis is well aware that she has no parental rights to Angela, as her brief in support of her motion for reconsideration in the district court indicated that she could not seek an order for visitation of Angela in the state courts, as "an order terminating parental rights is not modifiable by the state courts. It permanently terminated all rights to the child, including any right to visitation." She then quoted In re Adoption of Michael J.C., 326 Pa.Super. 143, 152-54, 473 A.2d 1021, 1026 (1984), rev'd on other grounds, 506 Pa. 517, 486 A.2d 371 (1984), as follows: "[t]ermination of parental rights does more than disrupt the parent-child relationship; it totally destroys it. 'The termination of parental rights ... means that the child is dead so far as that parent is concerned.' "
 
 
 31
 The McClintons had standing to bring the termination petition under Adoption Act Sec. 2512(a)(3) which authorizes a termination petition to be brought by any person having custody of a child under 18 years of age, provided that the petitioner has filed a report of intention to adopt under Adoption Act Sec. 2531. Thus, the proceedings leading to the surrender of Angela's custody to the McClintons and Davis's inability to regain her custody were in a legal sense immaterial to the procedure in the termination case. Furthermore, the substantive issues in the termination case were unrelated to the manner by which Davis surrendered custody of Angela. Considering these circumstances, we are unable to perceive how an adjudication of invalidity of the proceedings prior and collateral to the involuntary termination proceedings could undermine the termination order under Pennsylvania law.[16] We therefore are satisfied that even if Davis could convince us that the legal principles which she advances are correct, this would not lead to a reinstatement of her parental rights to Angela.
 
 
 32
 We indicated in Gregory v. Chehi, 843 F.2d 111, 116 (3d Cir.1988), that a "federal court applying preclusion principles is bound by the Full Faith and Credit statute, 28 U.S.C. Sec. 1738, and must give a prior state judgment the same effect as would the adjudicating state" and "[t]he same results follow in section 1983 suits brought in federal courts." Here the Pennsylvania termination proceedings eliminated the interest in Angela that Davis sought to secure and, as the federal courts must give full effect to those proceedings, Davis could obtain no parental rights to Angela in the district court.
 
 
 33
 It follows from the foregoing analysis that Davis has never had standing in this case to the extent that she has sought particularized relief with respect to Angela. See Allen v. Wright, 468 U.S. 737, 750-52, 104 S.Ct. 3315, 3324-25, 82 L.Ed.2d 556 (1984). Once the termination order was entered, Davis could no longer demonstrate that she had suffered an injury "likely to be redressed by a favorable decision." Simon v. Eastern Kentucky Welfare Rights Organization, 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976). In short, she had nothing to gain with respect to Angela by establishing that the procedures she challenges were invalid. As the Court of Appeals for the Seventh Circuit indicated in Matter of Special March 1981 Grand Jury, 753 F.2d 575, 577 (7th Cir.1985), "[i]t is not enough, to give you standing, that you have been hurt by someone; you must have something tangible to gain from your suit--some alleviation of or compensation for, the hurt. Otherwise the suit is as much an academic exercise as if it were brought to prevent a nonexistent harm."In point of fact, notwithstanding Davis's claim to the contrary, she has been seeking in the federal courts to undo the termination order of the Common Pleas Court, because she has been seeking restoration of her parental rights, at least in part, terminated in the Common Pleas Court. See Anderson v. Colorado, 793 F.2d 262, 264 (10th Cir.1986). Therefore, if she obtains the relief she seeks, the order of January 28, 1986, "will, regardless of the form of any new order, be effectively altered and revised." American Motorists Ins. Co. v. Levolor Lorentzen, Inc., 879 F.2d 1165, 1170 (3d Cir.1989). This is necessarily so because, as she is well aware, she has had no rights to Angela since January 28, 1986. But she simply does not have standing to seek such relief, as the order of January 28, 1986, has not been directly challenged, is conclusive as to her, will remain valid regardless of the result of this action, and cannot be modified by indirection.[17]
 
 
 34
 Our result that Davis does not have individual standing with respect to Angela is buttressed by the decision of the Supreme Court in Lehman v. Lycoming County Children's Services Agency, 458 U.S. 502, 102 S.Ct. 3231, 73 L.Ed.2d 928 (1982), which, though not directly applicable here, is nonetheless instructive. There, the Supreme Court considered whether a district court had jurisdiction under 28 U.S.C. Sec. 2254(a) to consider a collateral challenge to a proceeding in the Pennsylvania state courts terminating parental rights. In particular, the parent attempted to invoke federal habeas corpus jurisdiction "to challenge the constitutionality of a state statute under which a State has obtained custody of children and has terminated involuntarily the parental rights of their natural parent." 458 U.S. at 507, 102 S.Ct. at 3235. The Court held that the habeas corpus jurisdiction could not be invoked.
 
 
 35
 In its opinion, the Court indicated that "federal courts consistently have shown special solicitude for state interests 'in the field of family and family-property arrangements,' " "[f]ederalism concerns and the exceptional need for finality in child-custody disputes argue strongly against the grant of" the petition, and "[t]he State's interest in finality is unusually strong in child-custody disputes." 458 U.S. at 512, 513, 102 S.Ct. at 3237, 3238. Surely the same considerations are present here and weigh strongly against affording Davis standing to seek parental rights, including visitation and reporting rights, with respect to Angela. How can we conclude otherwise in the face of a valid order which has terminated Davis's rights? See also Lewis v. Continental Bank Corp., --- U.S. ----, 110 S.Ct. 1249, 1253-55, 108 L.Ed.2d 400 (1990).
 
 
 36
 Davis has urged, however, that even if she cannot obtain particularized relief as to Angela, the case is capable of repetition but evasive of review, so that her individual case should be heard though it might otherwise be moot. We observe, however, that this is not a case in which her claim is barred as moot. Rather, as we have indicated, Davis has never had standing. In any event, a court may apply the rule permitting it to hear an otherwise moot case capable of repetition but evasive of review "only in exceptional situations, and generally only where the named plaintiff can make a reasonable showing that he will again be subjected to the alleged illegality." City of Los Angeles v. Lyons, 461 U.S. 95, 109, 103 S.Ct. 1660, 1669, 75 L.Ed.2d 675 (1983). See Lewis v. Continental Bank Corp., 110 S.Ct. at 1255. From the outset of this action any suggestion that Davis would again be in the circumstances involved in this case would have been a total speculation. We also note that Davis indicates in her brief that she is now married and lives with her husband and her two children in Nevada, making the likelihood that she will be subject again to proceedings similar to those challenged here far fetched.[18]
 
 
 37
 The final issue before us is whether the district court correctly refused to certify the matter as a class action. We hold that it did not err in that ruling. Inasmuch as Davis did not have individual standing when the action was brought, she cannot be regarded as a member of the class she sought to represent. See Sosna v. Iowa, 419 U.S. 393, 402-03, 95 S.Ct. 553, 559, 42 L.Ed.2d 532 (1975). In Tucker v. Phyfer, 819 F.2d 1030, 1033 (11th Cir.1987), the court explained:
 
 
 38
 It is well settled that at the time a plaintiff brings suit he must have standing to prosecute his claim; he must have a 'personal stake' in the outcome of the litigation. The mootness doctrine requires that the plaintiff's controversy remain live throughout the litigation; once the controversy ceases to exist, the court must dismiss the cause for want of jurisdiction. In a class action, the claim of the named plaintiff, who seeks to represent the class, must be live both at the time he brings suit and when the district court determines whether to certify the putative class. If the plaintiff's claim is not live, the court lacks a justiciable controversy and must dismiss the claim as moot. (Omitting citations.)
 
 
 39
 Here we are not concerned with events after the filing of the district court complaint rendering the case moot, as Davis lacked standing at the outset.[19]
 
 
 40
 The order of June 8, 1989, will be affirmed.
 
 
 41
 BECKER, Circuit Judge, concurring in part and dissenting in part.
 
 
 42
 I concur in the judgment affirming the orders of the district court except insofar as the majority affirms the district court's decisions denying class certification and finding that Davis has no standing and that her claim is moot. In these respects, I dissent. As I understand the majority's decision, it is based on the following logic: (1) the parental rights termination adjudication is independent of the pre-termination proceedings that Davis challenges; (2) the relief Ms. Davis seeks impinges upon the termination adjudication itself; (3) because Davis cannot collaterally attack the termination adjudication, she has no standing to challenge the pre-termination procedures; and (4) because she lacks standing, Davis cannot bring a class action. In my view, the majority glosses over a critical and determinative point: the termination adjudication was initiated by the McClintons and the McClintons were free to initiate the termination of Davis's rights only because of the allegedly unconstitutional state procedures which allowed the McClintons to have custody in the first place. Thus, the proceedings are not independent, but interdependent.
 
 
 43
 Davis's complaint has identified several serious problems with Pennsylvania's private intermediary adoption procedures. Even if, as I suspect, Pennsylvania would not accord the rights of visitation or report that Davis asks for, I believe that the majority's failure to consider the critical role of the pre-termination procedures and its additional failure to apply the recent jurisprudence concerning the scope of the fundamental rights of a parent, have led it into error on the standing question. I would hold that Ms. Davis has standing to sue even though her action was brought after the termination decree; that her case is not moot; and that her case should have proceeded as a class action, with leave to substitute a different class representative if her absence from Pennsylvania prevented her from being an adequate class representative.
 
 
 44
 This opinion will primarily address the standing, mootness, and class action determination questions. It will not address the issue of preclusion because I do not understand the majority's decision to turn on preclusion.[1] Before reaching the jurisdictional and procedural questions, however, it will be useful to identify the basis of Davis's claims and the relief she seeks, because the standing, mootness and class action issues can be better understood against that background.
 
 I. THE CHALLENGED PRACTICES
 
 45
 Davis requests injunctive and declaratory relief based on three constitutional arguments: substantive due process, procedural due process, and equal protection. Davis's substantive due process claim is rooted in the alleged ambiguity of the consent form authorized by 23 Pa.C.S.A. Sec. 2711 (Purdon Supp.1989). Davis maintains that by signing the form, which the state required her to sign before Ullman could legally take custody of her child, she effectively relinquished her fundamental right to her child without knowing what she was doing. The form did not make clear that it effected a relinquishment; nor did it make clear that she had the statutory right to revoke her consent.[2] Davis argues that the form was so misleading and contradictory as to deprive her of her fundamental right to her child.
 
 
 46
 Davis's procedural due process claim attacks the procedures that the state law allows and the family court judge utilized in denying her effective revocation. Davis asserts that she repeatedly told her attorney that she wanted to revoke her consent. She petitioned the court for custody of her child, but without any evidentiary hearing as to her fitness, the court stayed her request for a custody determination until after a parental rights termination petition, which had not even been filed yet, could be decided. Davis argues that by allowing six months to elapse before giving her any opportunity to see and provide for her child, the state failed to provide the procedure mandated for even a temporary deprivation of her parental rights. The temporary deprivation is particularly devastating in these situations, she submits, because it denies the natural parent the opportunity to bond with her child (which would increase her fitness as a parent), while allowing the prospective adoptive couple to deepen their relationship with the child (and giving them more time to build a case against the natural mother for involuntary termination of parental rights).
 
 
 47
 Davis's equal protection claim is based on the state's differential treatment of parents who relinquish custody of their children to the state for public adoption, and those who relinquish custody to a private intermediary. Both groups of parents sign the same consent form, and the parent's right to revoke, pursuant to that consent form, is valid up until parental rights are finally terminated, Commonwealth ex rel. Grimes v. Yack, 289 Pa.Super. 495, 433 A.2d 1363 (1981); K.N. v. Cades, 288 Pa.Super. 555, 432 A.2d 1010 (1981). According to Davis, however, the effectiveness of that revocation is completely dependent on whether one has placed the child in public or private hands.
 
 
 48
 If the child is placed with a state agency and the parent revokes consent, the child automatically returns to the parent unless the state moves to have the child adjudicated as dependent pursuant to 42 Pa.C.S.A. Sec. 6341 (Purdon 1982). A preliminary hearing to determine custody must be held within 72 hours of the revocation. 42 Pa.C.S.A. Sec. 6332 (Purdon 1982). During the period that the child is with the state agency, after the preliminary hearing, the parent is entitled to visitation at least every two weeks, and the agency is required to provide the parent with reunification services, which include counseling services, parent education, homemaker/caretaker services and childcare. 55 Pa.Code Sec. 3130.35. If, despite those services, the agency still believes that termination is appropriate, and the state shows by clear and convincing evidence at a second hearing that the child is dependent, then a full dispositional hearing must be held within twenty days of the dependency finding. At that hearing, the state must prove that circumstances make a new placement (i.e., an adoption) necessary and the state must also show that previous efforts to re-unify the child with the parent have been made. 42 Pa.C.S.A. Sec. 6341 (Purdon 1982). In total, there are three hearings.
 
 
 49
 None of these services or procedural safeguards are provided to the parent who places her child with a private intermediary, despite the fact that the law governing that parent's right to her child, and more specifically, her right to revoke her consent, are identical to those of a parent who relinquishes custody to the state.[3] Davis requested counseling services from the state, but was told that she could not receive them because the state did not have custody of her child. She had no right to visit Angela before the involuntary termination hearing was held. Moreover, no evidentiary hearing was held to determine whether Davis's revocation should be ineffective or whether temporary custody should be vested in someone other than Davis.
 
 
 50
 In the public agency placement situation, the state must prove, at a preliminary hearing, that temporary relinquishment is necessary. Here, Davis was not even given the opportunity to argue that it was not. Moreover, when a public agency is involved, timing of the hearings is governed by statute; when a private intermediary is used, the potential adoptive couple (who at that point have no legal rights to the child) and the court control when the hearings will be held. Davis alleges that it is standard practice for the judge, at least in Delaware County, to delay any evidentiary custody hearing until after an involuntary termination hearing has been held, even if, as in this case, the parent petitions for custody before a termination petition has been filed.
 
 
 51
 Davis asserts that because the state's adoption regulations infringe on the fundamental rights of natural parents, the arbitrary differences in treatment between public and private procedures violate the Equal Protection Clause. She concedes that the state's interest in protecting children from unfit parents is compelling, but submits that the state has no interest in treating parents who use public adoption services differently than parents who use private adoption services.
 
 
 52
 In addition to the claims described above ("the structural claims"), which she asserts on behalf of herself and a class of similarly situated natural mothers, Davis asserts a claim for individual relief based on the alleged deprivation of her constitutional rights. More specifically, she asks this court to grant her visitation and report rights as a way of remedying in part the alleged constitutional deprivation, i.e., the loss of her parental right to her child.
 
 II. STANDING
 A. The Scope of the Parental Right
 
 53
 Any discussion of standing in this type of case must commence with an understanding of the scope of the right at stake. In Lassiter v. Department of Social Services, 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981), the Supreme Court stated that it "is plain beyond the need for multiple citation that a parent's desire for and right to 'the companionship, care, custody and management of his or her children' is an important interest that 'undeniably warrants deference and, absent a powerful countervailing interest, protection,' " Id. at 27, 101 S.Ct. at 2159-60 (quoting Stanley v. Illinois, 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551 (1972)).
 
 
 54
 The right of natural parents was recently confirmed by five members of the Court in Michael H. v. Gerald D., --- U.S. ----, 109 S.Ct. 2333, 105 L.Ed.2d 91 (1989). Justice Stevens found that, although sufficient process had been afforded to protect a putative father's interest, the father nonetheless had a "constitutionally protected interest in his relationship with [his child]." Id. 109 S.Ct. at 2347 (Stevens, J., concurring in the judgment). Four other justices also found such a constitutional right.[4] See id. at 2349 (Brennan, J., dissenting); and id. at 2360 (White, J., dissenting). See also Santosky v. Kramer, 455 U.S. 745, 759, 102 S.Ct. 1388, 1397, 71 L.Ed.2d 599 (1982) (After quoting from Lassiter and Stanley, the court noted that "[w]hen the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it"); Lehr v. Robertson, 463 U.S. 248, 256, 103 S.Ct. 2985, 2990, 77 L.Ed.2d 614 (1983) ("The intangible fibers that connect parent and child have infinite variety. They are woven throughout the fabric of our society, providing it with strength, beauty, and flexibility. It is self-evident that they are sufficiently vital to merit constitutional protection ...") Thus, there is little question that the right Davis asserts is a very important one.
 
 
 55
 Furthermore, the jurisprudence makes clear that the content of the parental right goes to the ongoing nature of the relationship between a parent and child. A deprivation of "companionship, care, custody, or management" of one's child is not a one-time deprivation; it is an ongoing deprivation. Relationships are not static; they exist and grow (or at least change) over time. Obviously, some relationships between people can die forever, but I find it implausible that a relationship between a natural mother and the child with whom she wishes to maintain a relationship, can ever die, at least in the mother's mind. That being the case, a state judgment prohibiting a mother from maintaining any relationship with her child constitutes an ongoing injury, for as long as the mother maintains the natural and constitutionally protected yearning for the knowledge that her child is safe, healthy, and hopefully even happy, a denial of visitation rights hurts that mother. It may be that the termination injury is constitutionally justified, but that does not mean that there is no injury.
 
 
 56
 Thus, City of Los Angeles v. Lyons, 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983), on which the defendants rely heavily, and which the majority invokes, at 222, is inapposite. In Lyons, the Supreme Court held that Mr. Lyons, suing as an individual plaintiff, had no standing to sue for injunctive relief to stop the Los Angeles police department's practice of chokeholding. Lyons had no standing because " '(p)ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse effects.' " Id., at 102, 103 S.Ct. at 1665 (quoting O'Shea v. Littleton, 414 U.S. 488, 495-96, 94 S.Ct. 669, 675-76, 38 L.Ed.2d 674 (1974)). Both Lyons and O'Shea sought injunctive relief against patterns and practices of a police department. Because the plaintiffs could not show that they were likely to suffer future injury because of the allegedly unconstitutional activity,[5] Id. 461 U.S. at 106, 103 S.Ct. at 1667, their injuries could not be redressed by the injunctive relief sought.[6]
 
 
 57
 In O'Shea, the Court went on to suggest that if "any of the named plaintiffs at the time the complaint was filed were themselves serving an allegedly illegal sentence or were on trial or awaiting trial," O'Shea, 414 U.S. at 496, 94 S.Ct. at 676, the standing determination would be different.[7] Davis is currently suffering from the allegedly unconstitutional action; she continues to be deprived of any right she might have to maintain contact with Angela.
 
 
 58
 In Lyons, the court held that the plaintiff's cognizable injury-in-fact--his past exposure to a chokehold--could not be redressed by injunctive relief. What would have been redressable by injunctive relief in his case was the possibility of being subject to a chokehold in the future, but the court found that potential future injury too speculative to be cognizable for standing purposes. "Abstract injury is not enough." Lyons, 461 U.S. at 101, 103 S.Ct. at 1665.[8] Davis's injury-in-fact is the deprivation of her parental rights. It is not "abstract," "conjectural" or "hypothetical," Id. 461 U.S. at 102, 103 S.Ct. at 1665, with regard to the pain this loss has already caused her or will cause her in the future. Mother-child relationships do not just go away. Injunctive relief, available from this court, can redress this injury because a declaratory judgment from this court might very well effect the likelihood that the state would be more sympathetic to her rights in the future, or would at least give her another chance to argue that it would be in Angela's best interest to maintain some relationship with her mother. See infra Part IIC.
 
 
 59
 Furthermore, this case is different from Lyons in ways which make the Lyons bifurcation of personal (i.e. damages) and injunctive relief inapposite. The Court found that Mr. Lyons had standing to sue for damages. His success on that claim would, in effect, require the federal court to declare chokeholds unconstitutional. The relief the court was unable to give was an injunction empowering the federal court to monitor, and theoretically prevent, the Los Angeles Police Department from continuing its unconstitutional procedures. Lyons is thus also partially distinguishable as a police pattern and practice case.[9] Moreover, in this case, almost all of the injunctive relief Davis asks for is declaratory in nature. To hold that she has no standing to make such a request would be irreconcilable with the conclusion, that I have reached, that her claims are, to some degree, redressable.
 
 
 60
 B. Effect of the Allegedly Unconstitutional Procedures
 
 
 61
 The majority posits that the pre-termination procedure was "prior and collateral to" the termination proceedings, see at 220. I cannot agree with such a proposition because I believe the pre-termination procedure and the termination proceeding are inextricably intertwined. The second, "collateral" proceeding could not have occurred but for the prior procedure. Undoubtedly, because the McClintons had custody, they had the right to institute the involuntary termination proceeding,[10] but the only reason they had custody was because of the allegedly unconstitutional prior proceedings. More particularly, in Davis's case, she has made out a colorable claim that, but for the vague and confusing form, the state's unfair procedures, and the state's refusal to facilitate reunification (in the absence of agency placement), there could have been no termination of parental rights.[11]
 
 
 62
 The majority, believing that the proceedings were collateral, felt bound by the termination adjudication and thus thought itself incapable of granting relief "even if Davis could convince [it] that the legal principles which she advances are correct." at 220. It is unclear to me how the majority squares its position with Michael H., the most recent Supreme Court pronouncement in this area. The majority states, ante at 220, that "the Pennsylvania termination proceedings eliminated the interest in Angela that Davis sought to secure." Five justices of the Supreme Court have made clear, however, that before a natural parent's right in his or her parenthood can be taken away, that parent must be afforded adequate procedure. 109 S.Ct. at 2349 (Brennan, J., dissenting).
 
 
 63
 In short, the Pennsylvania procedures cannot conclusively eliminate Davis's interest if it is those procedures that she is challenging. Davis challenged procedures as did the parents in Santosky (whose parental rights had been "eliminated" at a hearing in which the state's burden was less than "clear and convincing" proof of unfitness), 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982)), and as did Michael H., (who asserted that the California law which "eliminated" his parental rights, did not adequately afford him the opportunity to maintain a relationship with his child).[12] The fact that California had not found it in the best interest of the child to afford Michael H. some visitation rights did not take away his standing to challenge those proceedings. Yet, if the majority opinion here is correct, Michael would never have had any standing to sue because the state of California had "eliminated" the interest he sought to protect. Even the plurality in Michael H., which found that the putative father of a child whose mother was married to someone else at the time of birth did not have a fundamental right to the parental relationship, did not find that Michael had no standing to sue.
 
 
 64
 In this case, the McClintons obtained custody pursuant to the Pennsylvania law which allows private intermediaries to grant custody to potential adoptive parents once a natural mother has signed the Sec. 2711 consent forms. As I read the law, the interdependent nature of the relevant consent, custody, adoption and termination statutes prevents a categorical separation of claims challenging the pre-termination law (by virtue of which Davis gave up temporary custody of Angela) from the termination law (by virtue of which Davis lost all of her parental rights). Therefore, in my view, the termination proceeding under Sec. 2512 cannot be considered collateral to the consent procedures, and Sec. 2711, which preceded it.
 
 
 65
 Nor do I believe that my finding that the proceedings are inextricably intertwined reduces Davis's claim to an argument that must be precluded under either issue or claim preclusion principles. In Pennsylvania, an issue is only precluded if, among other things, "the party against whom the plea is asserted was a party or in privity with a party to the prior adjudication, and [ ] the party against whom it is asserted has had a full and fair opportunity to litigate the issue in question in a prior action." Kelley v. TYK Refractories Co., 860 F.2d 1188, 1194 (3d Cir.1988). See also Odgers v. Commonwealth Unemployment Compensation Board of Review, 514 Pa. 378, 389, 525 A.2d 359, 364 (1987); Safeguard Mutual Insurance Co. v. Williams, 463 Pa. 567, 574, 345 A.2d 664, 668 (1975). Similarly, as pointed out supra in note 1, claims are precluded under Pennsylvania law, only if there is a similarity of the thing sued on, the persons and parties to the action, and the quality or capacity of the parties suing or sued. Gregory v. Chehi, 843 F.2d 111, 116 (3d Cir.1988).
 
 
 66
 None of the defendants in Davis's federal action were parties in In Re Adoption of A.N.D., the state court decision which originally terminated Davis's rights. Under Pennsylvania law, family court proceedings are considered non-adversarial. The court makes a decision based on the fitness of the natural parent, 23 Pa.C.S.A. Sec. 2511(a)(2) and the needs and welfare of the child, 23 Pa.C.S.A. Sec. 2511(b). The Department of Public Welfare, defendant herein, has nothing to do with the proceeding and cannot be considered in privity with the McClintons, who are the only conceivable "parties" whose rights were determined below. Davis had no opportunity to raise her constitutional claims against the state because she was not in court against the state. The judge was only determining her fitness as a parent, not whether her rights as a parent had been unjustly abrogated. The Family Court had no jurisdiction to determine the constitutional claim, 23 Pa.C.S.A. Sec. 2511, and the Superior Court only had authority to review, under a deferential standard, what the Orphan's Court had adjudicated, Lookabill v. Moreland, 336 Pa.Super. 520, 485 A.2d 1204 (1984), which, to repeat, included only parental fitness, not constitutional issues. Because Davis's claims could not have been adjudicated therein, she cannot be precluded from raising them here.
 
 
 67
 In sum, Davis is not making a collateral attack on the termination proceeding, and she is not asking this court to determine whether the termination adjudication was correct. Rather, she is asking us to determine whether Pennsylvania's statutory scheme is sufficiently protective of her fundamental right as a parent, and she is asking us, as did the parents in Alsager v. District Court, 518 F.2d 1160 (8th Cir.1975), to invalidate a state procedure pursuant to which she lost her child.
 
 
 68
 The majority distinguishes Alsager by saying that the plaintiffs in Alsager challenged the termination proceedings directly, at 221, n. 17. Thus, the federal court finding that the proceedings were unconstitutional entitled the plaintiffs to new proceedings. If, as I believe, the distinction between the pre-termination proceedings and the termination adjudication is invalid in the context of this case, then a finding that the pre-termination proceedings are unconstitutional may impermissibly infect the later adjudication. Thus, I do not believe that Alsager is distinguishable on the standing issue.
 
 
 69
 The majority maintains that Davis concedes the collateral nature of the proceedings, at 220, note 16. With respect, the majority misreads Davis's argument. By noting that "[t]he involuntary termination proceeding could have occurred whether or not Sara Davis had initially given her voluntary consent to a an adoption," Reply Brief at 4, Davis merely recognizes that the McClintons had the authority to initiate the termination proceeding by virtue of their custody, no matter how obtained.
 
 
 70
 C. The Effect of Davis's Failure To Ask for Reinstatement of her Parental Rights
 
 
 71
 The majority seems also to be saying that because Davis did not ask for reinstatement of her parental rights (Davis asked only for visitation and report rights), we are prevented from hearing the case. See ante (at 213). I disagree. When there has been a constitutional violation, a federal court can adjust remedies so as to afford appropriate relief. Bell v. Hood, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946). We might not feel comfortable granting the relief that Davis requests,[13] but if we could afford her any relief that might redress her harm, the standing requirements are met. None of the standing cases, see, e.g., Allen v. Wright, 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984); Office of Workers' Comp. Programs v. Perini North River Associates, 459 U.S. 297, 103 S.Ct. 634, 74 L.Ed.2d 465 (1983); Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982); Simon v. Eastern Kentucky Welfare Rights Org., 426 U.S. 26, 39, 96 S.Ct. 1917, 1924-25, 48 L.Ed.2d 450 (1976); Warth v. Seldin, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), indicates that the degree of available relief matters.
 
 
 72
 In Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), the Supreme Court held that the state had not met the constitutionally required burden of proof when terminating the Santoskys' parental rights, but the Court did not "redress" the Santoskys' injury by giving them their parental rights back. "We, of course, express no view on the merits of petitioners' claims. At a hearing conducted under a constitutionally proper standard, they may or may not prevail." Id. 455 U.S. at 770 (footnote omitted), 102 S.Ct. at 1403. The Supreme Court ruled that the procedures to which the Santoskys had been subjected did not conform to constitutional norms. Thus, the Santoskys were entitled to a new hearing. Similarly in this case, we might find that Davis had not been afforded the constitutional protection to which she was entitled and that therefore she should be entitled to a new hearing.
 
 
 73
 In light of the complexities and sensitivities of family law determinations, it might be wholly inappropriate for this court to reinstate some of Davis's parental rights, particularly given that Angela has been living, presumably happily, with the McClintons for several years now. Nonetheless, I do not find Davis's request for relief so outlandish as to require federal courts to refuse even to hear the claim. Davis's allegations of constitutional violations described in Part I are substantial,[14] and she may be entitled to another chance to assert that it would be in Angela's best interest to maintain some form of contact with her mother.
 
 
 74
 Such a holding would give Davis the proverbial "second bite (in state court) at the apple," but given that she may have been lured into having to eat of the fruit in the first place, such a second bite may be entirely appropriate. As Professor Shapiro has noted: "[F]ederal courts have a heavy burden. They must be vigorous in enforcing constitutional guarantees, but they should act in a way that leaves breathing space for the state courts.... [T]he remedies of the declaratory judgment and the injunction, and the class action device need not frustrate that goal. In sensitive hands, they can be used to help strike the right balance between federal and state concerns." Shapiro, State Courts and Federal Declaratory Judgments, 74 Nw.U.L.Rev. 759, 780 (1979).
 
 
 75
 I note that Pennsylvania has granted visitation rights to step-parents who have established a relationship with a child, see Burke v. Pope, 366 Pa.Super. 488, 531 A.2d 782 (1987), and to non-biological parents who have established a relationship with a child, see Commonwealth v. Coburn, 384 Pa.Super. 295, 558 A.2d 548 (1989); Seger v. Seger, 377 Pa.Super. 391, 547 A.2d 424 (1988). The majority is right in stating that these cases do not establish that a natural parent whose parental rights have been (involuntarily) terminated have visitation rights, at 219, but neither do these, or any case establish that a natural parent cannot be granted some rights.
 
 
 76
 The standard for whether some rights, such as visitation rights, should be granted to non-parents is what is in the best interest of the child. See Burke, 366 Pa.Super. at 493-94, 531 A.2d at 784-85; Coburn, 384 Pa.Super. at 304, 558 A.2d at 552; and Seger, 377 Pa.Super. at 399, 547 A.2d at 427. This standard is paramount: "[T]he concept of waiver is inappropriate in a child custody/visitation case ... [because] ... [w]e cannot allow the procedural aspects of custody matters to take precedence over the welfare of the child." See Seger, 377 Pa.Super. at 394, 547 A.2d at 425. Furthermore, as President Judge Cirillo noted in concurrence in Coburn, 558 A.2d at 554, "the knowledge of one's biological parents and hereditary history is crucial in ordering one's affairs and making life's decisions."[15] Given Pennsylvania's concern with the welfare of the child and the arguable importance, for a child, of knowing who his or her natural parents are, the Pennsylvania court might well fashion some remedy that afforded Davis less than parental rights but more than what she has now, i.e., no rights at all.
 
 
 77
 Ms. Davis is not a terribly sympathetic plaintiff. However, poor, pregnant women, without financial or emotional support from family or friends, rarely have lives that anyone would care to emulate. That does not mean that these women can be summarily dismissed as bad people or bad parents. As the Supreme Court wrote in Santosky:
 
 
 78
 [T]he fundamental liberty interest of natural parents in the care, custody and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child.... If anything, persons faced with forced dissolution of their parental rights have a more critical need for procedural protections than do those resisting state intervention into ongoing family affairs.
 
 
 79
 455 U.S. at 753, 102 S.Ct. at 1394-95. I note in this regard that Davis's papers suggest that she has stabilized her life and put her days of irresponsibility and drug dependency behind her. She offered to introduce evidence that there are putative class members who, without any realistic knowledge of what they were doing, and often because of extreme economic hardship and concern for their children, temporarily surrendered custody of their children.[16]
 
 
 80
 In sum, I believe that the jurisprudence establishes that a natural mother has a fundamental right to a relationship with her child, and that a deprivation of that right must be categorized as an ongoing injury. I further believe that the termination proceeding cannot be viewed as independent and collateral to the procedures which necessarily preceded it. Accordingly, I believe that Davis's challenge to the procedures constitutes a claim that we must entertain, despite the state court's prior termination of her parental rights. Her standing does not depend on her likelihood of success, but depends on whether a judgment from this court might be able to afford her any form of relief.
 
 III. MOOTNESS
 
 81
 The majority dismisses the mootness question because, consistent with its logic, Davis never had standing. If she never had standing, the majority reasons, the claim could not have become moot. at 221-22. However, for the reasons I have set forth at length, I believe that Davis had standing. I also conclude that, given the nature of her injury, the case cannot be moot.
 
 
 82
 The majority makes much of the fact that although Davis had come to realize that she had been deceived by the Pennsylvania consent form, she did not file her federal claim until after the family court's decree of involuntary relinquishment. I do not think that point dispositive. Even if Davis had filed her federal claim before the final termination hearing, it is highly unlikely that she would have been heard by the federal courts until after the termination proceedings. Federal courts do not always move with the greatest dispatch and, once they were ready for the termination hearing, the McClintons had an interest in expediting the termination hearing. Furthermore, if the federal court heard Davis's case prior to the termination hearing, it might well have found her injury too speculative because she had not yet been denied her child. See Schlesinger v. Reservists Committee to Stop the War, 418 U.S. 208, 220-21, 94 S.Ct. 2925, 2932, 41 L.Ed.2d 706 (1974) ("Concrete injury ... is that indispensable element of a dispute which serves in part to cast it in a form traditionally capable of judicial resolution.... [C]oncrete injury removes from the realm of speculation whether there is a real need to exercise the power of judicial review in order to protect the interests of the complaining party."). Davis was thus caught in a vise. Before the termination hearing her injury was arguably too speculative to constitute constitutional injury, and after that hearing, according to the majority, her injury was too final.
 
 
 83
 In sum, I find that this case is not moot. First, Davis has alleged an ongoing injury, and if this court's judgment can alleviate that injury, her claim cannot be moot. Second, because of the critical timing difficulties just described, I would conclude, if it were necessary, that this claim falls into the well-established "capable of repetition, yet evading review" mootness doctrine. See Roe v. Wade, 410 U.S. 113, 125, 93 S.Ct. 705, 713, 35 L.Ed.2d 147 (1973); Murphy v. Hunt 455 U.S. 478, 482, 102 S.Ct. 1181, 1183-84, 71 L.Ed.2d 353 (1982). Finally, I note that Davis's ability to meet the additional Murphy criteria, i.e. that there be a "reasonable expectation that the same complaining party would be subjected to the same action again," 455 U.S. at 482, 102 S.Ct. at 1184, is also unproblematic despite the fact that she now lives out of state, because the ongoing nature of the injury, as analyzed above, means that the relevant unconstitutional "action" is ongoing. Moreover, I do not find it unlikely in this mobile society, that someone who has lived most of her life in Pennsylvania, and whose family is still here, will return to Pennsylvania after a sojourn in Nevada.
 
 IV. CLASS ACTION DETERMINATION
 
 84
 The majority also affirms the district court's denial of class certification on grounds involving Davis's lack of standing. Because Davis did not have individual standing when the case was brought, according to the majority, she could not be considered an adequate class representative. Given my view that Davis does have standing as an individual, I would reverse on the class issues. Our review of class certification determinations is usually limited to whether the district court abused its discretion in denying the motion, see Bogus v. American Speech & Hearing Assoc., 582 F.2d 277, 289 (3d Cir.1978), but if the issues involved are primarily ones of law, our review is plenary, see Bailey v. Sullivan, 885 F.2d 52, 54 (3d Cir.1989).
 
 
 85
 It is unclear what, exactly, the district court relied on when denying certification of the class. The court appears to have been concerned that all of the class members had different factual stories and therefore did not meet the commonality and typicality requirements of Fed.R.Civ.P. 23(a)(2) or (3) Appendix at 37, 51.[17] However, the factual differences in the stories of the putative class members are not relevant to their primary legal claim, which is that the consent form they signed and the procedures to which they were subjected, were constitutionally deficient. The defendant's response to the class claim would be unitary as well, i.e., the form is clear enough and the procedures pass constitutional muster.[18] Since Davis asserted a countywide class, numerosity would not appear to be a problem.[19]
 
 
 86
 Because Davis has no conflict with other class members, adequacy of representation primarily turns on the ability of counsel to carry on the case. See Hohmann v. Packard Instrument Company Inc., 399 F.2d 711, 714 (7th Cir.1968); Symposium on Class Action, The Class Representative: The Problem of the Absent Plaintiffs, 68 Nw. U.L.Rev. 1133, 1136 (1974); see generally, H. Newberg, On Class Actions Sec. 3.24 (2d ed. 1985 & Supp.1989). I have no doubt that plaintiff's able and highly experienced counsel would readily meet the standard for "vigorous, conscientious and undivided" representation. Hohmann, 399 F.2d at 714. Even if the district court had concluded that Davis's out-of-state status did not render her an adequate representative, many courts have held that plaintiff's residence outside of the forum state does not render her an inadequate class representative. See generally H. Newberg, On Class Actions Sec. 3.39, and cases cited therein. However, even if deference to the district court would require us to resolve this issue against Davis, because I believe that she has asserted a colorable claim, and because I believe the other requirements of Rule 23(a) are met, I think the court should have afforded plaintiff an opportunity to provide a substitute, which is the common practice. Id.
 
 
 87
 Finally, the defendant has acted or refused to act on grounds generally applicable to the class as a whole. See Fed.R.Civ.P. 23(b)(2). Thus, given that the only reason the district court cited for denying class certification, i.e., different factual stories, is irrelevant, I believe that the class should have been certified. A finding of class certification would have been particularly important in this case, of course, because if a class had been certified, mootness and standing concerns would not foreclose adjudication. See United States Parole Commission v. Geraghty, 445 U.S. 388, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980).
 
 
 88
 For the foregoing reasons, I respectfully dissent.
 
 SUR PETITION FOR REHEARING
 
 89
 Before HIGGINBOTHAM, Chief Judge, and SLOVITER, BECKER, STAPLETON, MANSMANN, GREENBERG, HUTCHINSON, SCIRICA, COWEN, and NYGAARD, Circuit Judges
 
 
 90
 The petition for rehearing filed by appellant in the above captioned matter having been submitted to the judges who participated in the decision of this court and to all the other available circuit judges of the circuit in regular active service, and no judge who concurred in the decision having asked for rehearing, and a majority of the circuit judges of the circuit in regular active service not having voted for rehearing by the court in banc, the petition for rehearing is denied. Chief Judge Higginbotham and Judge Becker would grant rehearing by the court in banc for the reasons set forth in Judge Becker's dissent.
 
 
 
 [1]
 The notice of appeal recites that the motion for reconsideration asked for reconsideration of both the February 5, 1988, order and the February 8, 1988, oral determination, also referred to in the notice as an order. In fact, the motion for reconsideration seems only to have asked the court to reconsider its order of February 8, 1988. Nevertheless, we are treating this appeal as implicating the February 5, 1988, order as well as Davis has clearly demonstrated her intent to appeal from that order
 
 
 [2]
 All parties agree that our standard of review is plenary on all issues, except that the McClintons assert that the denial of class certification is reviewed on an abuse of discretion standard, citing Bogus v. American Speech & Hearing Ass'n, 582 F.2d 277, 289 (3d Cir.1978). We have concluded that this appeal on all issues is determined by the application of legal precepts and thus we are exercising plenary review. United States v. Adams, 759 F.2d 1099, 1106 (3d Cir.), cert. denied, 474 U.S. 906, 971, 106 S.Ct. 275, 336, 88 L.Ed.2d 236, 321 (1985). While there is some dispute of facts, we believe that the facts that we set forth are in accordance with Davis's view of them. Of course, we do not suggest that Davis agrees with the findings of fact in the state proceedings, though there can be no dispute that they were made
 
 
 [3]
 Apparently, she could not look to her own family for aid, an inference we draw from the circumstance that she had spent several years in foster homes under the custody of Children and Youth Services of Delaware County
 
 
 [4]
 We are not concerned with the interests of Angela's father, as he has consented to the termination of his parental rights and has not revoked that consent or sought to participate in these proceedings. Thus, an order terminating his parental rights stands unchallenged
 
 
 [5]
 The letter in the appendix is addressed only to Ullman. We, however, accept Davis's representation that it was sent to the judge as well
 
 
 [6]
 The judge orally stayed the proceedings on September 23, 1985
 
 
 [7]
 The opinion was filed on June 6, 1986, apparently in accordance with Pa.R.App.P. 1925(a), after Davis appealed to the Superior Court. According to the opinion of the district court in this case of February 5, 1988, Davis filed exceptions to the order of January 28, 1986, but they were denied on March 24, 1986 by Judge Catania
 
 
 [8]
 The Canadian testimony was taken by deposition in Canada but made part of the record in Delaware County
 
 
 [9]
 This opinion was described by the district court when this case was reached for trial on February 8, 1988, as being "in excruciating detail," a characterization which was intended to be highly complimentary
 
 
 [10]
 Angela's name was changed in the adoption proceedings. We will, however, as a matter of convenience continue to refer to her as Angela. We have permitted the record to be supplemented to reflect the adoption which was entered June 9, 1989, in the Court of Common Pleas of Delaware County, one day after the district court denied the motion for reconsideration
 
 
 [11]
 This was the definition given by Davis on her third motion for class certification
 
 
 [12]
 We find it unnecessary to discuss that disposition, as Davis can obtain no relief against the McClintons
 
 
 [13]
 Theresa Yochum Morris is listed in the caption as a party. She had been a plaintiff in Davis's amended complaint but on October 27, 1987, by stipulation the case was dismissed as to her and thus we make no further reference to her
 
 
 [14]
 Because the court anticipated that a motion for reconsideration would be filed, no order of dismissal was then entered
 
 
 [15]
 We realize that Judge Catania, Cohen, and Ullman were not parties to the Common Pleas Court proceedings but that does not matter as Davis is nevertheless bound by the result. See Shuder v. McDonald's Corp., 859 F.2d 266, 273-74 (3d Cir.1988). Furthermore, the McClintons were parties to that proceeding and Davis cannot obtain relief with respect to Angela without affecting their rights
 
 
 [16]
 In her reply brief Davis clearly buttresses this conclusion, as she acknowledges the independence of the termination proceeding under Adoption Act Sec. 2512 from the execution of the consent under Adoption Act Sec. 2711 by her statement that "[t]he involuntary termination proceeding could have occurred whether or not Sara Davis had initially given her voluntary consent to an adoption." Indeed, Davis admits that her "parental rights may have been involuntarily and validly terminated under the standard required by Pennsylvania Law" but argues that if her constitutional rights had not been "blatantly violated by the events leading up to the termination, the outcome of the proceeding might have been different or the proceeding might not have occurred at all." Of course, we are aware of the Supreme Court's decision in Michael H. v. Gerald D., --- U.S. ----, 109 S.Ct. 2333, 105 L.Ed.2d 91 (1989), relied upon in the dissent, but we do not see the significance of the holding here. The dissent indicates that the "right of natural parents was recently confirmed by five members of the [Supreme] Court" in that case. But that proposition was never in doubt here. Indeed, in Cohen's brief he indicates that "[i]t is certainly true that parents have a constitutionally protected interest in their children...." Undoubtedly Davis originally had all the rights of a parent to Angela but she lost them when the unassailable termination order was entered
 
 
 [17]
 Davis cites Alsager v. District Court, 518 F.2d 1160 (8th Cir.1975), in support of her contention that she has standing, but the case is distinguishable. There, the Court of Appeals held that natural parents could bring a declaratory judgment action in the district court under 42 U.S.C. Sec. 1983, seeking a declaration that their constitutional rights had been violated by a state court proceeding which resulted in the termination of their parental relationship with five of their children. They challenged the Iowa statute which provided the conditions under which a parent-child relationship could be terminated. Thus, they made a direct attack on the termination proceedings, as they urged that the standards pursuant to which their rights were terminated were invalid. On remand the termination proceedings were declared to be unconstitutional and were invalidated. Alsager v. District Court, 406 F.Supp. 10, 13, 26 (D.Iowa 1975), aff'd per curiam, 545 F.2d 1137 (8th Cir.1976). Here, there is no challenge to the validity of the involuntary termination proceeding as such. Indeed, Davis treats that proceeding as valid. Therefore, the termination order would, unlike that in Alsager, have retained its validity even if Davis had been successful on her legal claims in the district court. Thus, though she is effectively seeking to modify that order, it bars this action, as her complaint is directed to matters legally independent of the proceedings by which her parental rights were terminated and the order may not simultaneously be treated as valid and yet be modified. In the circumstances, we have no reason to discuss the Alsager procedure which permitted the withholding of claims from a forum in which it may well have been possible to assert them, thus splintering the litigation
 
 
 [18]
 We realize that Davis feels that the issues raised in this case are of great importance and should be considered on the merits. That contention, however, gives us no basis to bypass standing requirements. Cf. Murray v. Silberstein, 882 F.2d 61, 67 (3d Cir.1989) (a moot case may not be heard simply because of the significance of the issues raised in it.)
 
 
 [19]
 In reaching our result, we have not overlooked the possibilities that, even after the entry of the order of termination of Davis's rights on January 28, 1986, the order could have been vacated by the Court of Common Pleas in response to exceptions filed by Davis or reversed on appeal. First of all in this regard we point out that even though the appellees relied on the state proceedings in their briefs as barring this action, in her reply brief Davis did not suggest that the order of January 28, 1986, should not be regarded as final. Nor did she make any such contention in her original brief. Furthermore, insofar as we can ascertain, Davis never contended in the district court that the outcome of this case was in any way dependent on the circumstances that she had filed exceptions to the order of January 28, 1986, and appealed from the order. In any event, we conclude that these possibilities were inherently too speculative a base on which to predicate a finding that Davis had standing following the entry of an order of termination of her parental rights after a trial. Thus, we decline to discuss the significance of the filing of exceptions to the order of January 28, 1986, and the preclusive effect under Pennsylvania law of an order, otherwise final, to which exceptions have been filed or from which an appeal has been taken. We also point out that the exceptions were overruled before Davis made her initial motion for class action certification, so that even if she could somehow be regarded as having standing prior to that time, the case then became moot as to her personally and she could no longer represent the class. Therefore, even without a standing analysis, we would have reached exactly the same result we have
 
 
 [1]
 In Migra v. Warren City School District Board of Education, 465 U.S. 75, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984), the Supreme Court held that a federal court must give the same preclusive effect to a prior state action as would a state court. In Pennsylvania, in order for claim preclusion to apply "[t]he two actions must share an identity of the (1) thing sued on; (2) cause of action; (3) persons and parties to the action; and (4) quality or capacity of the parties suing or sued." Gregory v. Chehi, 843 F.2d 111, 116 (3d Cir.1988) (citing Dusquesne Slag Products Co. v. Lench, 490 Pa. 102, 105, 415 A.2d 53, 56 (1980)). Applying this test, I do not see how Davis's constitutional claim before this court could be precluded by the termination proceedings. First and foremost, the parties are different. In this action, Davis is suing, among others, the state and attorney Ullman. Davis was not suing anyone in the termination proceeding. Indeed, neither she nor the McLintons were named as parties; the proceedings were entitled In Re Adoption of A.N.D., 360 Pa.Super. 157, 520 A.2d 31 (1986) alloc. denied, 516 Pa. 638, 533 A.2d 710 (1987). Moreover, the issue adjudicated in In Re Adoption of A.N.D. was Davis's competence as a parent, not the constitutionality of Pennsylvania's private adoption procedures, which, according to the allegations of Davis's complaint, include a pattern and practice of unconstitutional activity by the family court judge who terminated her rights
 
 
 [2]
 A right to revoke consent may imply both that one has relinquished rights and that the right to revoke consent is established by some legal authority. Davis argues that any such implications must be laid out with specificity given the importance of the constitutional right at issue. Arguably, this is a procedural rather than a substantive due process claim, but for the purposes of this opinion, I will accept Davis' characterization
 
 
 [3]
 House Bill 2133 (1989 Session), recently introduced by State Representative Lois Sherman Hagarty of Montgomery County, would equalize some facets of the private intermediary and public agency routes to adoption. In Sec. 2530, the bill provides that a preplacement investigation and report, which must include an extensive evaluation of the prospective adoptive parent or parents, must be filed in every case. Sec. 2530(b)(2). Proposed Sec. 2505 requires that all natural parents signing the relinquishment consent form be advised of counseling services available and proposed Sec. 2531 requires that an additional report be filed detailing whether the parents whose rights are to be terminated have received counseling and the dates on which counseling was received
 
 
 [4]
 It should be noted that none of the justices suggested that a natural mother, whose biological relationship to the child is absolutely undisputed, did not have a fundamental right to her child. Four justices found that a putative father did not have a fundamental right to a relationship with his alleged child, born to a woman who was married to another man at the time of the child's birth. Michael H., 109 S.Ct. at 2333-47 (Opinions of Justices Scalia and O'Connor)
 
 
 [5]
 As several commentators have pointed out, the overlap between standing and mootness is substantial. See Fallon, Of Justiciability, Remedies, and Public Law Litigation: Notes on the Jurisprudence of Lyons, 59 N.Y.U.L.Rev. 1 (1984); P. Bator, D. Meltzer, P. Mishkin, & D. Shipiro, Hart and Wechsler's The Federal Courts and The Federal System 266-269 (3d ed. 1988); L. Tribe American Constitutional Law 83 (2d ed. 1988). I address the mootness question below
 
 
 [6]
 I note that the relief sought in this case does not require the kind of judicial interference with law enforcement structure that seemed to give the Supreme Court pause in both Lyons and O'Shea. See Hart & Wechsler at 267-68 (3d ed. 1988); Tribe at 121-24 (2d ed.1988)
 
 
 [7]
 The Court noted that if either of these possibilities were the case, there would be exhaustion or abstention problems, but the important point for our analysis is that, despite other potential jurisdictional problems, the plaintiffs would have standing if they were still suffering from the allegedly unconstitutional practices. I note that neither exhaustion nor abstention is at issue here. The state proceedings had been finally adjudicated when the district court denied Davis standing
 
 
 [8]
 Footnote 8 in Lyons, 461 U.S. at 107, 103 S.Ct. at 1659, suggests that emotional consequences are relevant to damages, not injunctive relief. Thus, the plaintiff's allegation that, because of his prior encounter with the police he lived in fear of the police, was insufficient to establish standing. One could classify Davis's injuries as "emotional" and thereby dismiss her action completely, but if any parent ever suffers an injury because of the termination of parental rights, that injury is emotional, not physical. The emotional nature of the injury does not make it any less "real." See supra at 215-16. Furthermore, because Lyons' injury was physical, the permance of that injury is irrelevant because physical injuries, in tort law, are generally considered to be confined to the date of occurrence for purposes of available remedy
 
 
 [9]
 Davis does ask for a cease and desist order enjoining Judge Catania from his allegedly unconstitutional pattern and practices, including always denying natural mothers visitation with their children (once the mothers have revoked consent) and failing to hold temporary hearings before holding parental rights termination hearings. This request for injunctive relief, clearly intended to aid class members who might sign the form in the future, might attempt to redress an injury--i.e. the likelihood that Judge Catania would treat all class members like this in the future--that, under Lyons we would be compelled to find too speculative
 
 
 [10]
 23 Pa.C.S.A. Sec. 2512(a) (Purdon 1980) provides: "A petition to terminate parental rights with respect to a child under the age of 18 years may be filed by ... (3) [t]he individual having custody or standing in loco parentis to the child and who has filed a report of intention to adopt...."
 
 
 [23]
 Pa.C.S.A. Sec. 2531(a) (Purdon 1980) provides: "Every person now having or hereafter receiving or retaining custody or physical care of any child for the purpose or with the intention of adopting a child under the age of 18 years shall report to the court in which the petition for adoption will be filed."
 
 
 [11]
 I admit that the exact relationship between Sec. 2711 and Sec. 2512 is not clear. Strictly reading the law, it is possible that Pennsylvania would allow the McClintons to initiate a termination proceeding, by virtue of their "custody," even if they had abducted the child in violation of state and federal law, and without a Sec. 2711 form ever having been filed. In theory, the termination proceeding only looks at the natural mother's fitness as a parent, so that even blatantly illegal conduct by the potential adoptive parents could not be considered. Thus, Sec. 2512 proceedings could operate completely independently from a Sec. 2711 consent. However, I refuse to believe that Pennsylvania would allow such a bizarre result. In this case, the only way that the McClintons had legal custody of Angela was pursuant to the Sec. 2711 form that the natural parent signed. Thus, I believe the proceedings cannot be considered collateral
 
 
 [12]
 Justice Stevens concurred in the judgment in Michael H. because he felt that California had sufficiently protected Michael's interest by providing him the opportunity to have a court determine whether it was in the child's best interest tomaintain a relationship. 109 S.Ct. at 2347. Justice Brennan, joined by Justices Blackmun and Marshall, criticized Justice Stevens's position as somewhat unrealistic because the record demonstrated that once a putative father has been denied parental rights, the California courts never determined that it was in the child's best interest to maintain a relationship, Id. at 2356. What is important, for our purposes, however, is not how the California law worked as applied, but that no justice questioned Michael's ability to challenge the California law
 
 
 [13]
 I believe that any such relief would have to be granted by the state court
 
 
 [14]
 I find particular force in her equal protection attack on the differences between agency and private intermediary adoptions. The right allegedly infringed on in state proceedings is probably fundamental, see supra typescript at 216-17, and hence the procedures would be subject to strict scrutiny
 
 
 [15]
 I note that proposed House Bill No. 2133, see supra n. 3, reflects that concern by providing for a central registry at which someone whose parental rights are being terminated can place personal information on file with the Department of Health, so as to facilitate future contact between the adopted child and the natural parent. Proposed Sec. 2511(c)
 
 
 [16]
 I am sympathetic to the desire of the McLintons to put the matter behind them once and for all. It seems to me, however, that adopting parents must live with the fact that the child is adopted, and that the child may someday wish to reestablish contact with his or her natural mother. Furthermore, I note that the McLintons might have violated Pennsylvania law when they negotiated Angela's move to their home in New Jersey. "No person shall take any child, send or cause him to be taken or sent to another state for the purpose of placement or of procuring his adoption without providing information to the department about the child and his placement." 62 P.S.A. Sec. 750 (1967)
 
 
 [17]
 Fed.R.Civ.P. 23(a) states:
 One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.
 
 
 [18]
 As this court has noted before, the typicality requirement overlaps, significantly, with the commonality and adequacy requirements. See Eisenberg v. Gagnon, 766 F.2d 770, 786 (1985)
 
 
 [19]
 The latest census data reveals that Delaware County has 555,007 residents, Pennsylvania Manual, Volume 109, Dec. 1989. Although plaintiff did not give a specific estimate of the class size (possibly because of the district court's focus on the lack of commonality), I believe that such an estimate would be readily ascertainable and suspect that it would satisfy the numerosity requirement. The number of females on Medicaid in Delaware County is 20,440. Pennsylvania Dept. of Public Welfare, Client Information Systems, Cash/Medical Statistical Analysis (Oct. 8, 1987). Although we have no way of knowing how many of these women may have put children up for adoption using private intermediaries, a conservative estimate suggests that the number would exceed 40, which is generally considered ample for a presumption of numerosity. See, H. Newberg, On Class Actions Sec. 3.05 (2d ed. 1985 & Supp.1989). The difficulty of finding these women, who are often isolated, afraid and embarrassed about their predicaments, also weighs heavily in favor of a numerosity finding